# UNITED STATES DISTRICT COURT

for the
District of Colorado

## In the Matter of the Search of

The residence located at 10522 Wagon Box Circle, Highlands Ranch, CO 80130 more fully described in ATTACHMENT A attached hereto, to include all out-buildings and vehicles located thereon and to include SARAH ALBERG at the time of the search warrant execution

)
)
)
)
)
)
)
)

Case No. 20-sw-557-MEH

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___State and___ District of ___Colorado___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X   evidence of a crime;

X   contraband, fruits of crime, or other items illegally possessed;

X   property designed for use, intended for use, or used in committing a crime;

☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of <u>21</u> U.S.C. §§ <u>331(a), 331(c), 331(d), 332 355, 841(a)(1) and c</u>, and <u>18</u> U.S.C. §§ <u>1341 and 1343</u> and the application is based on these facts:

X   Continued on the attached affidavit, which is incorporated by reference.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Christopher Gann*
_____
*Applicant's signature*

Christopher Gann, Special Agent, FDA-OCI
_____
*Printed name and title*

Sworn to before me and:   ☒ signed in my presence.
☐ submitted, attested to, and acknowledged by reliable electronic means.

Date:   <u>05/04/2020</u>

*Michael E. Hegarty*
_____
*Judge's signature*

City and state:   <u>Denver, CO</u>

Hon. Michael E. Hegarty, U.S. Magistrate Judge
_____
*Printed name and title*

<u>**AFFIDAVIT**</u>

I, Christopher Gann, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## I.      <u>INTRODUCTION AND AGENT BACKROUND</u>

1.      I am currently employed as a Special Agent with the United States Food and Drug Administration, Office of Criminal Investigations (FDA-OCI).  I have been a Special Agent with the FDA-OCI since March of 2014.  Prior to my current assignment, I was a Special Agent with Homeland Security Investigations for 13 years.  I have successfully completed the Criminal Investigator Training Program and the FDA's Special Agent Training Program at the Federal Law Enforcement Training Center.  During my career as a federal investigator, I have conducted a wide range of criminal investigations involving misbranded and adulterated drugs, mail fraud, wire fraud, narcotics smuggling, and money laundering.  As a Special Agent with FDA-OCI, I am responsible, among other duties, for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), Title 21 U.S.C. §§ 301-399, and other applicable violations of Title 18 of the United States Code.

2.      This affidavit is submitted in support of an application for search warrants for two locations:

a.      the house located at 10522 Wagon Box Circle, Highlands Ranch, CO 80130, more fully described in ATTACHMENT A, and believed to be both the residence of SARAH ALBERG and the office of her business, TRIM CONTOUR (hereinafter the "SUBJECT PREMISES");

b.      the storage unit located at 4111 Siskin Avenue, unit 1069, Highlands Ranch, CO 80126 more fully described in ATTACHMENT C, believed to be used by SARAH ALBERG for the storage of records and inventory related to TRIM CONTOUR (hereinafter the "SUBJECT STORAGE UNIT");

and the computer(s) located therein, there being probable cause to believe that located in those places are items respectively described in ATTACHMENTS B and D, being evidence, fruits, and instrumentalities of criminal violations of federal laws relating to the labeling, branding, and distribution of drugs, including introducing and causing the introduction of misbranded drugs into interstate commerce (21 U.S.C § 331(a)), receiving causing the receipt of, and proffering for delivery for pay or otherwise misbranded drugs in interstate commerce, (21 U.S.C. § 331(c)), introducing and causing the introduction of "new drugs" lacking FDA approval (21 U.S.C. § 331(d)), distributing controlled substances (21 U.S.C. § 841(a)(1) and (c)); and federal laws relating to fraud and false statements, including 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud) (the "SUBJECT OFFENSES").

3.      As set forth in more detail below, I submit there is probable cause to believe that SARAH ALBERG owns and operates a business called TRIM CONTOUR at her residence. TRIM CONTOUR sells and causes the interstate distribution of Human Chorionic Gonadotrophin (HCG) weight loss sublingual drops, HCG weight loss cream, and HCG weight

1

loss gel.  The HCG weight loss drops kit include vials of HCG powder, a bottle of an unknown liquid, and a cream.  These HCG products are misbranded within the meaning of: (a) 21U.S.C. § 352(a) in that they are drugs whose labeling is false or misleading; (b) 21 U.S.C.§ 352(f)(l) in that they are prescription drugs whose labeling fails to bear adequate directions for use; and (c) 21 U.S.C. § 353(b)(l) in that they are prescription drugs that were dispensed without a valid prescription while held for sale.  HCG drugs whose labeling prescribes, recommends, or suggests use for weight loss are "new drugs" that have not been approved by FDA under 21 U.S.C. § 355

4.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES are presently located at the SUBJECT PREMISES and in the SUBJECT STORAGE UNIT.

5.      The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## II.      BACKGROUND:  THE REGULATION OF DRUGS BY THE FDA AND RELATED CRIMINAL STATUTES

### A.      General Definitions

6.      Under the Food, Drug, and Cosmetic Act (hereinafter FDCA), "interstate commerce" means commerce between any State or Territory and any place outside thereof, and commerce within the District of Columbia or within any other Territory not organized with a legislative body.  21 U.S.C. § 321(b).

7.      Under the FDCA, "label" means a display of written, printed, or graphic matter upon the immediate container of any article.  21 U.S.C. § 321(k).  The term "labeling" is defined as all labels and other printed or graphic matter upon any article or any of its containers or wrappers or accompanying such article.  21 U.S.C. § 321(m).

### B.      The Definition of "Drug" in the FDCA

8.      Under the FDCA, "drugs"  are defined as, among other things: (a) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; (b) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (c) articles intended for use as a component of any articles specified in (a) or (b) above.  21 U.S.C. § 321(g) (l)(b)-(d).

9.      A product's intended use is not determined by the intrinsic properties of the product, but by the seller's objective intent in promoting, distributing, and selling the product. S*ee United States v. An Article . . . "Sudden Change"*, 409 F.2d 734, 739 (2d Cir. 1969); *see also* 21 C.F.R. § 201.128. The objective intent is determined, inter alia, by such persons' expressions, labeling claims, advertising matter, or oral or written statements by such persons or their representatives. *See Hanson v. United States*, 417 F. Supp. 30, 35 (D. Minn. 1976), *aff'd*, 540

F.2d 947 (8th Cir. 1976); *see also United States v. Storage Spaces Designated Nos. "8"1 and "49"*, 777 F.2d 1363, 1366 (9th Cir. 1985) ("intent may be derived or inferred from labeling, promotional material, advertising, or any other relevant source.").  Indeed, even water can be a drug if it is claimed to have curative properties. *See United States v. 353 Cases . . . Mountain Valley Mineral Water*, 247 F.2d 473 (8th Cir. 1957).

10.    A "new drug" is any drug which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof. 21 U.S.C. § 321(p)(1). In order to be lawfully marketed, sold or dispensed in the U.S., a new drug must be the subject of a New Drug Application ("NDA") approved by the FDA. 21 U.S.C. § 355.

11.    A "prescription drug" under the FDCA is a drug that: (i) because of its toxicity and other potential for harmful effects, or the method of its use, or the collateral measures necessary to its use, was not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or (ii) was limited by an application approved by FDA, to use under the professional supervision of a practitioner licensed by law to administer the drugs.  21 U.S.C. § 353(b)(l).

C.    **"Misbranded Drugs" under the FDCA**

12.    Dispensing a prescription drug without a valid prescription by a licensed practitioner is deemed by statute to be an act with causes the drug to be misbranded while held for sale.  21 U.S.C. § 353(b).

13.    A drug is also misbranded if (a) its labeling is false or misleading in any particular, 21 U.S.C. § 352(a) or (b) its labeling does not bear adequate directions for use, 21 U.S.C. § 352(f)(11).

14.    "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it was intended without a doctor's supervision. 21 C.F.R. § 201.5.  Directions under which a *layperson* can use a drug safely cannot be written for a prescription drug because such drugs can, by definition, only be used safely at the direction, and under the supervision, of a licensed practitioner.  Approved prescription drugs dispensed pursuant to a valid prescription are exempt from having adequate directions for use by a layperson.  But prescription drugs that are unapproved new drugs or dispensed without a valid prescription are necessarily misbranded for lacking adequate directions for use.

D.    **The Criminal Penalties of the FDCA**

15.    The FDCA contains several criminal provisions.  Relevant here are the provisions of 21 U.S.C. § 331.  Section 331(a) makes it a crime to introduce or deliver for introduction into interstate commerce any misbranded drug.  Section 331(c) makes it a crime to receive in interstate commerce any misbranded drug, or to deliver or proffer the delivery for pay or otherwise any misbranded drug.  Section 331(d) makes it a crime to introduce or deliver for introduction into interstate commerce any unapproved new drug.  These crimes are strict-liability

misdemeanors under 21 U.S.C. § 333(a)(1).  *See United States v. Park*, 421 U.S. 658 (1975). But they are felonies if they are committed with an "intent to defraud or mislead" either consumers or government regulators.  21 U.S.C. § 333(a)(2).

### E.    Other Crimes Associated with the Distribution of Drugs

16.    Other statutes asides from the FDCA criminalize behavior associated with the distribution of drugs.  The mail and wire fraud statutes, for example, punish schemes to defraud or the use of false and fraudulent representations, pretenses and promises to obtain things of value executed, respectively, through the mail or interstate wires.  And the Controlled Substances Act imposes criminal penalties on individuals who distribute controlled substances when not specifically authorized to do so.  Adderall, described in more detail below, is a Schedule II controlled substance.

## III.    THERE IS PROBABLE CAUSE TO BELIEVE THAT SARAH ALBERG IS COMMITTING THE SUBJECT OFFENSES

### A.    The Consumer Complaint Regarding SARAH ALBERG's Business

17.    On January 29, 2020, the FDA-OCI Denver Domicile Office received a Consumer Complaint from the FDA Office of Regulatory Affairs regarding an allegation made by SARAH ALBERG's ex-husband.  The complaint alleged that SARAH ALBERG was manufacturing and selling HCG under the company name TRIM CONTOUR from her house and a storage unit both in Highlands Ranch, CO. A review of the TRIM CONTOUR website (www.trimcontour.com) revealed the company sells HCG Weight Loss Drops, HCG Cream, and HCG Gel.  The "Testimonials" section of the website shows before and after pictures of TRIM CONTOUR patients who have lost weight using the products. At the bottom of the homepage, there is a statement that reads, "This product has not been approved for weight loss by the Food and Drug Administration and is not intended to diagnose, treat, cure or prevent any disease".

18.    HCG or "Human Chorionic Gonadotropin" is a hormone that is produced by the human placenta during pregnancy.  FDA has approved several HCG prescription drugs for the treatment of female infertility and other medical conditions.  FDA has not, however, approved any HCG drug for weight loss. HCG can only be obtained by prescription from a licensed prescriber.

20.    HCG has gained popularity as a weight loss aid despite no substantial evidence that it is safe or effective in promoting weight loss.  In fact, the FDA-approved labeling of Pregnyl® and Novarel®, which are two FDA-approved HCG prescription drugs, contain the following upper-case warning statement:

HCG HAS NOT BEEN DEMONSTRATED TO BE EFFECTIVE ADJUNCTIVE THERAPY IN THE TREATMENT OF OBESITY. THERE IS NO SUBSTANTIAL EVIDENCE THAT IT INCREASES WEIGHT LOSS BEYOND THAT RESULTING FROM CALORIC RESTRICTION, THAT IT CAUSES A MORE ATTRACTIVE OR "NORMAL" DISTRIBUTION OF

FAT, OR THAT IT DECREASES THE HUNGER AND DISCOMFORT ASSOCIATED WITH CALORIE-RESTRICTED DIET.

19. Despite the lack of sufficient scientific evidence of safety and efficacy of using HCG for weight loss, the TRIM CONTOUR website makes several statements showing that the HCG offered for sale through TRIM CONTOUR is intended as a safe and effective treatment for weight loss. For example, the website contains the statements (1) "It [the TRIM CONTOUR product, for which I have probable cause to believe is HCG] is safe to use and no side effects have been reported as such," and (2) "We at Trim Contour ensure that you lose within a scientific and systematic manner over a period of time so that it does not adversely affect your health. And if you try to lose weight overnight or very quickly by some other means, it may prove to be a disaster."

20. A search of the FDA Automated Information Management System revealed that SARAH ALBERG contacted FDA-OCI in 2010 regarding her mother, Deirde Stephens, who was manufacturing and distributing HCG as a weight loss drug.

21. On January 31, 2020, I and another FDA-OCI Special Agent interviewed SARAH ALBERG's ex-husband. He stated in sum and substance and in pertinent part:

      a. That his ex-wife ALBERG began working for her mother's company, Millennium Medical Spa in Newport Beach, CA in 2000. The spa sold HCG and Phentermine to their patients.

      b. In January 2018, ALBERG's mother passed away and ALBERG took over the company and changed the name to TRIM CONTOUR.

      c. ALBERG manufactures and distributes HCG products from her house in Highlands Ranch and stores some of the product at a Public Storage unit in Highlands Ranch, CO. ALBERG rents the storage unit under his father's name and the storage unit — the SUBJECT STORAGE UNIT for which I am seeking a warrant — is located at 4111 Siskin Avenue, unit 1069, Highlands Ranch, CO.

      d. His minor children have informed him that they help "mommy make medicine" and receive an allowance for their services.

      e. He knew at one time ALBERG was selling the prescription drug Phentermine (which I know, from my training and experience, is a Schedule IV Controlled Substance) to certain clients.

      f. ALBERG used accounting software on a home computer in the loft of the SUBEJCT PREMISES to document transactions associated with the TRIM CONTOUR business.

**B.  The Undercover Inquiries to SARAH ALBERG Regarding TRIM CONTOUR's Products**

22.     On February 5, 2020, an FDA-OCI agent acting in an undercover capacity, emailed info@trimcontour.com and asked the user of that account if its products were approved by the FDA and if the products are made in the United States. In summary, the person using that email address, replied and stated, "The product is not approved by the FDA for weight loss-which is common with weight loss products or any supplement that you can buy."  The person using that email address stated that her HCG Weight Drops are her best product and you can expect one pound of weight loss per day.  The person using that email address stated the cost for a one-month supply is $250. The email received was signed "Sincerely, Sarah Alberg," and based on the evidence set forth below I submit there is probable cause to believe that the user of the info@trimcontour.com email address is SARAH ALBERG.

23.     On February 14, 2020, an FDA-OCI agent acting in an undercover capacity ("Undercover Agent 1") consensually recorded a call received from SARAH ALBERG (949-302-4042) in which Sarah identified herself upon Undercover Agent 1 answering the phone. During the call Undercover Agent 1 ordered a one-month supply of the TRIM CONTOUR Weight Loss Drops for $250. Undercover Agent 1 requested that the order to be shipped to an undercover address in Mission, Kansas. During the recorded call, ALBERG described the TRIM CONTOUR product as a hormone that is used by women during pregnancy to break down fat reserves to give to the fetus. ALBERG further explained that when the product is used with a low-calorie diet, it has the same effect as breaking down fat and providing it to the body for energy and food, thus having the ability to lose weight without feeling hungry. During the recorded phone call, ALBERG didn't ask Undercover Agent 1 any medical history questions.

24.     On February 14, 2020, Undercover Agent 1 received an email from TRIM CONTOUR with verification that the package (USPS tracking# 9405 5112 9837 0546 7107 86) had been mailed to Mission, Kansas. On the same date, Undercover Agent 1 received an email from SAlberg@trimcontour.com that had the TRIM CONTOUR Information Packet attached. The email was signed in the name of SARAH ALBERG, President, Cell (949) 302-4042, Phone (949) 208-7000. The Information Packet contained directions for using the TRIM CONTOUR Weight Loss Drops and a nutrition guide.  As set forth above, HCG cannot be provided without a prescription.  This means, by definition, that "adequate directions for use" cannot be written for its use by a layperson — it can only be used safely at the direction and under the supervision of a licensed practitioner.  Accordingly, the TRIM CONTOUR product that ALBERG represented to be an HCG product is necessarily "misbranded" under the FDCA.

25.     On February 19, 2020, I received the parcel from the February 14, 2020, undercover purchase and inventoried the following items: (1) a glass vial containing a white powder-like substance labeled TRIM CONTOUR and to contain "Human Chorionic Gonadotrophin Proprietary Formula", (2) a dark-colored bottle containing unknown liquid and labeled "Developed by and Manufactured for Global Weight Loss Solutions Irvine, CA 92614, (949) 208-7000, www.trimcontour.com", (3) a shipping envelope addressed to the name and address of the Undercover Agent from TRIM CONTOUR with the return address of the SUBJECT PREMISES, (4) a sales receipt, and (5) a 1 milliliter dropper.

6

26.     On February 20, 2020, agents observed SARAH ALBERG depart the SUBJECT PREMISES and drive to the Highlands Ranch Post Office located at 9609 South University Blvd in Highlands Ranch, CO. ALBERG was observed carrying a manila mailing envelope similar in color and size to the mailing envelope received from the undercover purchase made of February 14, 2020. After departing the Post Office, ALBERG drove to the UPS Store located at 9457 South University Blvd, Highlands Ranch, CO. Agents observed one of ALBERG's minor children exit the vehicle carrying a shipping envelope similar to the envelope ALBERG was observed carrying into the Post Office minutes earlier.

27.     On February 20, 2020, I contacted a United States Postal Inspector and provided him the label information from the parcel received from the undercover purchase on February 14, 2020. The Postal Inspector was able to determine that the parcel I had received from the February 14, 2020, undercover purchase belonged to a provider customer with an address in Louisville, KY. Using the ID 6475889, the Postal Inspector was able to identify 108 parcels (November 2019-February 2020) mailed from the Littleton, CO Post Office and to numerous states throughout the United States to include the parcel received in Mission, Kansas from the undercover purchase on February 14, 2020. In addition, regarding the surveillance from February 20, 2020, the Postal Inspector identified the two parcels that I observed SARAH ALBERG dropping off that day. The two parcels both had the SUBJECT PREMISES as a return address. One parcel shipped to Manhattan Beach, CA and the other parcel was shipped to Portland, OR.

28.     On March 31, 2020, another FDA-OCI agent acting in an undercover capacity ("Undercover Agent 2") placed a phone call to SARAH ALBERG and stated she needed to lose weight and was wanting to purchase Phentermine but was unable to obtain any from her doctor due to the on-going pandemic. ALBERG stated she was currently out of stock of Phentermine but requested for Undercover Agent 2 to contact her in two weeks.

29.     On April 14, 2020, Undercover Agent 2 placed a follow up call to SARAH ALBERG.  ALBERG stated she didn't have the prescription appetite suppressant in stock but did have a custom formulation appetite suppressant in stock. SARAH ALBERG stated that a one-month supply was $50 plus $20 shipping.  ALBERG stated to take two capsules daily and recommended that Undercover Agent 2 not take a capsule late in the day because it can affect her sleep. I know, from my training and experience, that a common side effect of amphetamines like Adderall is insomnia.  ALBERG attempted to sell the undercover agent her HCG product and recommended that Undercover Agent 2 take it in conjunction with the appetite suppressant. In addition, ALBERG stated that she has lowered the cost of the HCG product to assist people who are out of employment due to the coronavirus. The undercover agent declined the HCG product. During the recorded phone call, ALBERG didn't ask Undercover Agent 2 any medical history questions. ALBERG stated she would email the undercover agent a tracking number and receipt.

30.     I have personally reviewed the recording of the April 14, 2020, call between Undercover Agent 2 and SARAH ALBERG.  During the call, ALBERG asked for and received a credit card number to pay for what she marketed as an "appetite suppressant."  In the background, I can hear t clicking sounds associated with typing on a keyboard.  Given the ex-husband's statement about ALBERG's use of a computer in the loft of the SUBJECT

PREMISES to log financial transactions, I believe it is likely that ALBERG was using a home computer to facilitate the April 14, 2020 sale of the "appetite suppressant."

31.     While the above-mentioned undercover order on April 14, 2020, was being placed, agents were conducting surveillance at SARAH ALBERG's residence located at the SUBJECT PREMISES. Approximately 90 minutes after the order was placed, agents observed ALBERG depart the SUBJECT PREMISES and drive to the Highlands Ranch Post Office located at 9609 South University Blvd. in Highlands Ranch, CO.  There, I observed ALBERG exit her vehicle and was carrying what appeared to be several mailing envelopes similar to the mailing envelope received from ALBERG from the undercover purchase. ALBERG entered the facility and exited approximately a minute later.

32.     On April 16, 2020, I acted in an undercover capacity as the husband of Undercover Agent 2 and emailed SARAH ALBERG at info@trimcontour.com.  In the email I informed ALBERG that I had not received the parcel or an email containing the receipt and tracking number. On April 17, 2020, in response to the email, Undercover Agent 2, who had placed the order on April 14, 2020, received a phone call from 949-302-4042.  The caller identified herself as SARAH ALBERG.  ALBERG stated the parcel is showing to have been delivered. ALBERG stated she did email Undercover Agent 2 the receipt and tracking number but realized during the call that she had the incorrect email address for Undercover Agent 2. Based upon correspondence mentioned earlier in this affidavit, agents have determined that 949-302-4042 is SARAH ALBERG's cell phone.

33.     On April 17, 2020, Undercover Agent 2 received the parcel in Lehi, UT from SARAH ALBERG and shipped it to me. On April 21, 2020, I opened the parcel and inventoried the following items: (1) a bottle labeled TRIM CONTOUR, Appetite Suppressant, Dietary Supplement, 60 sustained release beadlet capsules, (2) a mailing envelope addressed to the undercover agent at an undercover address with the SUBJECT PREMISES listed as the return address (USPS tracking 9405 5112 0308 5008 46), and (3) a sales receipt.  I observed the capsules to be clear and orange in color with the beadlets to be orange and white in color. There were no observable markings on the capsules.  Based on my training and experience, as well as an open records search into various amphetamines, I believe that the capsules purchased from ALBERG are similar in appearance to Adderall, which is a Schedule II controlled substance prescribed to treat Narcolepsy and Attention Deficit Disorder.  Adderall is not approved by the FDA to treat weight loss. Adderall is approved by the FDA for the treatment of Attention Deficit Disorder and Attention Defect Hyperactivity Disorder.

34.     On April 27, 2020, I searched through the trash discarded from the SUBJECT PREMISES. Prior to searching the trash, I observed the Waste Management truck clear the truck hopper of all trash, stop in front of the SUBJECT PREMISES, and deposit SARAH ALBERG'S trash into the hopper. I then followed the Waste Management truck to a location out of view of the SUBJECT PREMISES and noted the Waste Management truck did not make any additional stops.   In the trash, I found two USPS parcels both addressed to ALBERG at the SUBJECT PREMISES.

35.     On May 1, 2020, I visited the publicly accessible Facebook profile for "Sarah Alberg."  The profile contains photographs of the same woman I and other agents saw leaving the SUBJECT PREMISES and depositing packages during surveillance on February 20 and April 14, 2020.  The evidence gathered in this case shows that SARAH ALBERG and her minor children are the only residents of the SUBJECT PREMISES.

## IV.     THERE IS PROBABLE CAUSE TO BELIEVE THAT EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF THE SUBJECT OFFENSES WILL BE FOUND AT THE SUBJECT PREMISES AND SUBJECT STORAGE UNIT

### A.  Background:  Technical Terms

36.     Based on my training and experience, I use the following technical terms to convey the following meanings:

37.     IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

38.     Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

39.     In this Affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, any physical object upon which computer data can be recorded, including desktop and laptop computers, computer hardware, computer software, volatile data, cellular telephones, tablets, server computers, gaming devices, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media, as well as, computer related documentation, computer passwords and data security devices, digital communications devices, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the Subject Offense(s) (collectively hereinafter, "computers").

### B.     Background: Computers, Electronic Storage and Forensic Analysis

40.     As described above and in ATTACHMENTS B and D, I submit that if computers are found at the SUBJECT PREMISES, there is probable cause to search and seize those items

for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

41.     For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

42.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

43.     Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files.  Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

44.     As further described in ATTACHMENTS B and D, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why

they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

45.     The monitor and printer show the nature and quality of the images or files that the system can produce.  In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

46.     The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit the offenses discussed in this affidavit.  Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein.  The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

47.     Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.  Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

48.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

49.     I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons

11

to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

50.     Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to search thoroughly storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

51.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

52.     For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

a.      On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

b.      On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

c.      On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

53.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment.  This is true because of the following:

a.      The nature of the evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

b.      The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to examine thoroughly storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e.      Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in ATTACHMENTS B and D in order to prevent unnecessary invasion of privacy and overbroad searches.  I advises it would be impractical and infeasible for the Government to review the mirrored images of digital

devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times are necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in ATTACHMENTS B and D.  In order to obtain the full picture and meaning of the data from the information sought in ATTACHMENTS B and D of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential for probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

54.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching, and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

C.     **The Use of the SUBJECT PREMISES, SUBJECT STORAGE LOCKER and as-yet-unidentified computers and digital devices to Commit the SUBJECT OFFENSES**

55.     As set forth above, SARAH ALBERG'S ex-husband told me that ALBERG manufactures and distributes HCG from the SUBJECT PREMISES. Furthermore, the ex-husband stated that his children have informed him that they help mommy make medicine at the house for an allowance and SARAH ALBERG'S office is located within the SUBJECT PREMISES in the loft. On two occasions, I have observed ALBERG depart her residence and drop off packages that had a return address of the SUBJECT PREMISES.  In addition, I have reviewed bank records for accounts in the name of SARAH ALBERG.  Those accounts list the SUBJECT PREMISES as ALBERG's residence.  The records describe transactions that I know, from my training and experience, relate to businesses involved in the distribution of drugs, including wire transactions with banks in India, which is a common source-country for the drugs, and deposits from internet-based payment platforms like Stripe, Paypal, and Zelle, which can be

used to take payments from customers.  The records also show expenses associated with the use of electronic devices and computers to run the business, including payments for the services of Intuit, which I know from training and experience is a company that creates, markets and sells business Quickbooks accounting software and payments for cell phone service from T-mobile. Based on this evidence, I submit that there is probable cause to believe that ALBERG is running the TRIM CONTOUR business from the SUBJECT PREMISES, that the business is engaged in the SUBJECT OFFENSES, and that ALBERG uses computers and cellular telephones to engage in that business.

56.      Based upon my work experience and training, as well as discussions with law enforcement agents, I know that:

a.       Businesses generally maintain or keep journals, ledgers, bank statements and records, receipts, invoices and other documents evidencing the receipts and disbursements of funds, inventories, assets of the business and personnel information. These records are usually kept and maintained for extended periods of time, often several years, at the place of business or residence. I know from previous investigations that such records are also often maintained at the residence of subjects.

b.       Individuals, including those receiving income from fraud schemes, often maintain within their residence records of assets and financial transactions. These items often include financial statements, receipts, invoices, bank statements and records, bank money order and cashier's check receipts, property records, investment records, assets, stock and bond records, tax records, correspondence, diaries, and handwritten notes. These records are often maintained for extended periods of time, often several years.

c.       Due to the increasing prevalence of electronic communications and storage, paper records can be converted and stored electronically. As a result, any record or document could be found in either paper or electronic format.

d.       Almost all wire transfers, even intrastate wire transfers, cross state lines. The same is true of email correspondence associated with the business.

e.       Search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit, to include credit card bills, telephone bills, correspondence and other identification documents.

f.       Search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

57.      As set forth above, SARAH ALBERG's ex-husband told agents that ALBERG uses the SUBJECT STORAGE LOCKER at the Public Storage business located at 4111 Siskin Avenue, unit 1069, Highlands Ranch, CO 80126 to store TRIM CONTOUR product.  The ex-husband stated that ALBERG had the unit rented in the name of his father because SARAH

ALBERG has bad credit.[1]  The ex-husband provided agents a copy of the rental agreement for unit 1069 that  has a signature in his father's name dated May 29, 2019.  The ex-husband told agents that his father does not have a key to the storage unit and does not store any items in the unit.

58.     A review of gate access records provided to agents by Public Storage revealed the following information.  Every customer that has a rental unit is provided a unique passcode that identifies which customer enters the entry gate, when they access the elevator, and when they exit the property.  In this case, the user of that code — listed in the paperwork as the ex-husband's father, but identified by the ex-husband and, as set forth below, in Public Storage surveillance footage as SARAH ALBERG — accesses the building that houses unit 1069 on a frequent basis with no observable pattern.  The most recent date when ALBERG entered the storage unit was on April 29, 2020. At 1:47:38 PM ALBERG accessed the Building A elevator keypad, and at 1:54:19 PM, ALBERG departed the exit gate. Note, the time when SARA ALBERG entered the entry gate was not captured possibly due to her "piggybacking" onto the property.

59.     On February 28, 2020, an FDA-OCI Special Agent observed surveillance footage provided by Public Storage.  The agent observed several instances in which the same woman seen during the surveillance on February 14 and April 20, 2020 and identified as ALBERG was observed entering the building that houses unit 1069 and exiting with various items.  For example, on February 24, 2020 — the most recent date for which surveillance footage from Public Storage was obtained — the agent observed ALBERG enter the building at 10:44 AM appearing to carry only a cell phone. At 10:48 AM, ALBERG was observed walking from the direction of unit 1069 towards the elevator and was pulling a cart that appeared to contain one large cardboard box, one white box, and a large roll of bubble wrap. At 10:50 AM, ALBERG was observed exiting the building pulling the cart that contained the above-mentioned items.

60.     I know, from my training and experience, that individuals involved in the sale and distribution of drugs in violation of the FDCA often communicate with their customers and suppliers using cellular telephones, which can be conveniently carried while operating all aspects of the business.  Because they are so convenient and used for so many different things — modern "smart phones" can be used by entrepreneurs to make calls, send text messages, update social media profiles used to market products, log into mobile payment platforms to keep track of payments, send emails, and recreationally browse the internet — they tend to be carried around by their users at all hours of the day.  As set forth above, bank records show that SARAH ALBERG pays for mobile telephone service.  Furthermore, the surveillance footage from Public Storage shows ALBERG using a cellular telephone.  I submit there is probable cause to believe that ALBERG uses a cellular telephone to facilitate the SUBJECT OFFENSES and that the cellular telephone will be found on her person or in the SUBJECT PREMISES during the execution of the search warrant.

---

[1] Evidence gathered later suggests that this was not the true motive for putting the storage locker in someone else's name.  An employee of Public Storage informed agents that they do not check their applicants' credit histories.

16

61.     I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size.  Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

62.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

63.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require.

64.     The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode.  Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone.  If the operating system is version 9.3 or later, that time frame shrinks to 8 hours.

65.     Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful.  For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to any Apple devices found at the SUBEJCT PREMISES while executing the search warrant.  The government may not be able to obtain the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button.  Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

66.     In addition, I know from my training and experience that many other mobile device manufactures have their own version of Touch ID—that is, a fingerprint recognition feature that the device's user can program and use to unlock the device. For instance, I know that Google Pixel phones and Google Pixel XL phones have a fingerprint sensor that can be used to unlock the device. Similarly, Samsung, LG, HTC, and other manufacturers also have devices with fingerprint sensors.

67.     Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

68.     Further, if a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

69.     Similarly, if a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

70.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

71.     As discussed in this Affidavit, I submit there is probable cause to believe that one or more digital devices, of unknown manufacture ("the Devices"), will be found during the search and on the person of SARAH ALBERG. The passcode or password that would unlock the Devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

72.     Due to the foregoing, I am informing the Court that if law enforcement personnel encounter any Devices that are subject to seizure pursuant to the requested warrants and may be unlocked using one of the aforementioned biometric features, law enforcement personnel intends to obtain from SARAH ALBERG the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of SARAH ALBERG to the fingerprint scanner of the Device(s) found at the SUBJECT PREMISES; (2) hold the Device(s) found at the SUBJECT PREMISES in front of the face of SARAH ALBERG to activate the facial recognition feature; and/or (3) hold the Device(s) found at the SUBJECT PREMISES in front of the face of SARAH ALBERG to activate the iris recognition feature, for the purpose of unlocking the Device(s) in order to search the contents as authorized by this warrant.

## **CONCLUSION**

73.     I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in ATTACHMENT A, and the SUBJECT STORAGE LOCKER DESCRIBED in ATTACHMENT C and to seize the items respectively described in ATACHMENTS B and D, which constitute fruits, evidence, and instrumentalities of the SUBJECT OFFENSES.

74.     I request that the warrant, this application and the affidavit be restricted until further order of the Court.  The search warrant in this case has not yet been executed. The likelihood of discovering the items sought in the search warrant would be diminished if the affidavit in support of the search warrant in this case were made publicly available before the warrant was executed.  In addition, public disclosure of the warrant or the information in the warrant application could seriously jeopardize other aspects of the investigation, which is ongoing, and may cause unknown co-conspirators (such as suppliers or others involved in the sale and distribution of misbranded, unapproved new drugs, or controlled substances) to flee or avoid the jurisdiction of the United States or result in the destruction of or tampering with evidence beyond the scope of this warrant (such as electronic evidence held in cloud storage).

Further, the affidavit in support of the search warrant describes investigative techniques that may jeopardize the ongoing investigation if the affidavit were to be disclosed, such as the use of undercover agents.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


_s/ Christopher Gann_____
Christopher Gann, Special Agent
FDA-OCI


SUBSCRIBED and SWORN before me this 4th day of May, 2020.

_____
HON. MICHAEL E. HEGARTY
UNITED STATES MAGISTRATE JUDGE


Application for search warrant was reviewed and is submitted by Bryan David Fields, Assistant United States Attorney.